UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF OF NEW HAMPSHIRE

| | | |
|---|---|---|
| Donna Esty, Administratrix for <br> The Estate of Hagen Esty Lennon | ) <br> ) <br> ) | No. 1:17-cv-00059-AJ |
| v. | ) <br> ) | |
| The Town of North Haverhill <br> and <br> Officer Ryan Jarvis <br> and <br> Officer Gregory Collins | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | |

# MEMO OF LAW IN SUPPORT OF OBJECTION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT ON BEHALF OF ALL DEFENDANTS

NOW COMES the Plaintiff, Donna Esty, Administratrix for the Estate of Hagen Esty-Lennon, by and through counsel, McGrath Law Firm, PA, and respectfully submits this Objection to Defendants' Joint Motion for Summary Judgment on Behalf of All Defendants.

**STANDARD OF REVIEW**

1. A trial court's grant of summary judgment is reviewed de novo. United States ex rel. Jones v. Brigham & Women's Hosp., 678 F.3d 72, 83 (1st Cir. 2012). Summary judgment is properly granted if the movant can demonstrate that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)2). A "genuine" dispute exists when a jury can reasonably interpret the evidence in the non-movant's favor. A "material" fact is "one that might affect the outcome of the suit under the governing law." Velez-Rivera v. Agosto-Alicea,

1

437 F.3d 145, 150 (1st Cir. 2006) (quoting Morris v. Gov't Dev. Bank of Puerto Rico, 27 F.3d 746, 748 (1st Cir. 1994).

2. The court must "draw all reasonable inferences from the record in the light most favorable to the nonmoving party."  McGrath v. Tavares, 757 F. 3d 20, 25 (1st Cir. 2014) (quoting Alicea v. Machete Music, 744 F.3d 773, 778 (1st Cir. 2014)).  And where the moving party raises a qualified immunity defense, the nonmoving party has the burden of showing that qualified immunity does not apply.  See Mitchell v. Miller, 790 F3d 73, 76-77 (1st Cir. 2015) (second prong); cf. Lopera v. Town of Coventry, 640 F. 3d 388, 395-96 (1st Cir. 2011) (first prong); Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011).

Here, there are several material fact disputes that show summary judgment should be denied.

**THE MATERIAL FACTS JUST PRIOR TO AND
DURING THE SHOOTING ARE DISPUTED**

1. On or about July 6, 2015, at approximately 3:30pm, Hagen Esty-Lennon (hereinafter referred to as "Hagen") was traveling in Bath, New Hampshire when he was involved in a single vehicle car accident that resulted in significant vehicle damage, air bag deployment and serious bodily injury rendering Hagen unresponsive.  See photo of car accident at Exhibit 5 attached hereto.

2. Hagen had already given his driver's license to a first responder and a fireman had concluded that there was no "immediate threat".  See Exhibit 9 attached hereto.

3. According to the Defendants' Memorandum Of Law In Support Of Joint Motion For Summary Judgment On Behalf Of All Defendants at approximately the same time on July 6, 2015 Town of Haverhill Police Officers Ryan Jarvis (hereinafter referred to as "Jarvis) and Greg Collins (hereinafter referred to as "Collins") were on duty, in full uniform, at the Haverhill Police Department when they heard over the radio that there

had been a motor vehicle accident in Bath, New Hampshire. See Exhibit 5 attached hereto. See (Jarvis Aff. ¶ 1); (Collins Aff. ¶ 1). Allegedly the officers learned that the accident scene was unsecured and that a man (later identified as Mr. Esty-Lennon) had been involved in the accident and was armed with a knife. Allegedly, dispatch requested that Haverhill Police respond to and secure the scene pursuant to their mutual aid agreement with the Town of Bath, New Hampshire.

4. Officer's Collins and Jarvis left the station in separate marked Haverhill police cruisers and while in route they allegedly learned information transmitted over the cruiser radios that there was an individual (later identified as Mr. Esty-Lennon) walking southerly on Route 302 away from the accident scene with what might be a stab wound to his chest. See photo of accident at Exhibit 5.

5. Florence Welch who was an eye witness to the accident, stated that at the accident scene, Hagen remained in the vehicle after the crash and a man on the scene opened the driver's door of Hagen's vehicle and asked if he was alright, Hagen did not respond. Hagen then exited the vehicle and sat on a rock on the bridge, then returned to the vehicle and got in the driver's seat for a brief moment before exiting the vehicle again and returned to sit on the rock before getting down on his knees and then laying on the ground on his stomach. Ms. Welch observed others at the scene roll Hagen onto his back and saw that he was gurgling because his mouth was full of blood. . See (Audio interview of Florence Welch). Ms. Welch suggested they roll Hagen onto his side because he was chocking, which they did. Hagen was bleeding from the mouth, was unresponsive, very disoriented, sweating profusely and his entire body was shaking. Just prior to Ms. Welch

leaving the accident scene an ambulance arrived and Hagen stood up on his own still appearing to be very disoriented. . See (Audio interview of Florence Welch).

6. Immediately following the accident, Ms. Sarah Hastings, who was at the campground across the street at the time of the accident, responded to the accident scene and found Hagen lying on the ground. Ms. Hastings indicated that Hagen seemed uneasy and was not talking clearly, but she understood him enough to believe he was wounded. Ms. Hastings opened Hagen's outer shirt and saw blood on the chest area of Hagen's undershirt and had another individual who was at the scene apply pressure to the wound with a towel. Ms. Hastings indicated that Hagen was "volume sensitive" and asked her to stop shouting at him, though she was not shouting. Ms. Hastings observed a knife on the ground a short distance from Hagen's feet. Ms. Hastings indicated that Hagen wasn't coherent and appeared to be "scatter brained" and disoriented and he was coughing up blood that was coming from his mouth. According to Ms. Hastings, as the ambulance was approaching Hagen was stirring and when he heard the siren he jumped up, grabbed the knife that was on the ground and started to leave. Ms. Hastings indicated that Hagen was unsteady on his feet. See (audio interview of Sarah Hastings).

7. At least one witness a fireman, stated that Hagen was "not an immediate threat to anyone". See witness statement of George Talatinian attached as Exhibit 1. These witness statements and details were not sought by the officers when they arrived and drew their weapons. (See Collins Deposition Transcript at Page 19 and 20).

8. The Plaintiff and both officers believe their body camera recordings most accurately capture the audio and visual activities that transpired between Hagen and the officers. (Jarvis Aff. ¶ 4); (Collins Aff. ¶ 2); see also (Jarvis Aff. Exh. 1 – Body Camera Video of

Officer Jarvis); (Collins Aff. Exh. 1 – Body Camera video of Officer Collins).

9. However, Officer Collins also gave his deposition on September 7, 2017. See Exhibit 2 attached hereto. Officer Collins testified that he did not consider that Hagen might be in shock and therefore behaving erratically. (Collins Deposition Transcript page 11). He did not know that another official that already talked to him and determined that he was not an immediate threat (Collins Deposition Transcript Page 11). See Exhibit 1. Officer Collins did not think Hagen had committed a criminal act, he did not think he was a felon or he was chasing someone that had committed a crime. He was not trying to arrest him. (Collins Deposition Transcript Page 33). He thought Hagen was running away from him at one point and he began pursuing him. (Collins Deposition Transcript Page 12 and 13). Officer Collins did not talk to any of the witnesses prior to chasing Hagen. He did not talk to the fireman or the other folks that were there (Collins Deposition Transcript Page 19). He did not talk to the fire official who was already on the scene or the man who was in the SUV in the video (Collins Deposition Transcript Page 20). Officer Collins had no information weather Hagen was in shock or medically injured from his car accident or mentally ill. (Collins Deposition Transcript Page 21). He had no concern of Hagen having a firearm (Deposition at Page 17). Collins mistakenly thought Officer Jarvis was telling him to leave his tazer so he dropped it. (Collins Deposition Transcript at Page 30).

10. Officer Jarvis was also deposed. See Exhibit 3 attached hereto. He also admitted that he had no information on the scene (Jarvis Deposition Transcript at Page 102). Officer Jarvis testified he did not know that the victim had already spoken to people on the scene

(Jarvis Deposition Transcript at Page 103).  Jarvis did not talk to the fireman who was on the scene and is shown in the video in the black SUV (Jarvis Deposition Transcript at Page 104).  He did not consider that Hagen had a head injury or that he was mentally ill (Jarvis Deposition Transcript at Page 105).  He did not see the car accident (See car accident photo at Exhibit 5).  Jarvis was approximately 30 yards away from Hagen when he pulled his weapon (Jarvis Deposition Transcript at Page 112).  He did not consider Hagen may have been deaf (Jarvis Deposition Transcript at Page 123).  He did not know who was in charge of the scene (Jarvis Deposition Transcript at Page 123).  Neither officer was really in charge (Jarvis Deposition Transcript at Page 123).  There was never any suggestion that Hagen had a gun (Jarvis Deposition Transcript at Page 123).  He admitted that there was confusion around his instruction to "leave it" and it was misunderstood by Officer Collins (Jarvis Deposition Transcript at Page 124).  Hagen was shot in the back (Jarvis Deposition Transcript at Page 126).  See Autopsy at Exhibit 6. Jarvis did not believe any crime had been committed ((Jarvis Deposition Transcript at Page 136).  Jarvis had no information about Hagen having committed any crimes prior to his arrival, so he did not think he was apprehending a criminal (Jarvis Deposition Transcript at Page 137).  Jarvis did not interview the first responder Officer George Talatinian who had already concluded that Hagen was "no immediate threat".  See Exhibit 1.

11. According to the Defendants' <u>Memorandum Of Law In Support Of Joint Motion For Summary Judgment On Behalf Of All Defendants</u>, as the officers exited their cruisers they both observed a man walking towards them.  Officer Collins shouted at the man to show his hands several times as the man continued to walk towards them.  See

(<u>Memorandum Of Law In Support Of Joint Motion For Summary Judgment On Behalf Of All Defendants</u>, page 3).  A review of the officers body cameras reveal that Hagen's hands were already in plain view.   Neither officer questioned the witnesses that were already on the scene.  (Collins Deposition at Page 103).

12. According to the Defendants' <u>Memorandum Of Law In Support Of Joint Motion For Summary Judgment On Behalf Of All Defendants</u> as Hagen continued to walk towards the officers they allegedly observed him put his hands into his pocket and pull out a knife with the blade open and visible to the officers.  (Jarvis Aff. ¶ 6); (Collins Aff. ¶ 4).  Jarvis allegedly observed the man walk toward them with a "deliberate pace and look on his face." At this point both officers began yelling at Hagen to drop the knife and to stop. "The officers unholstered their service weapons and pointed them at Hagen as he continued to walk towards them with the knife still in his right hand.  In an attempt to get Hagen to drop the knife and stop moving toward the officers Jarvis yelled to Hagen that he would shoot him.  Hagen did not drop the knife, but he did stop walking toward the officers for a moment.  Hagen did not say anything, looked behind him, looked back at the officers and turned away and  started walking back toward the campground.

13. At this point the officers became the aggressors and moved forward.  (<u>See</u> Exhibit 1, 2, and 3)  Both officers started to walk towards Hagen cautiously with their weapons pointed at him.  Collins holstered his weapon, drew his Taser, and walked toward Hagen. Jarvis moved toward Hagen and provided cover for Collins with his firearm raised and pointed.  Hagen began running quickly away from the officers in a northerly direction on Rout 302 toward the campground.  The officers pursued Hagen and continued several

times to shout at Hagen to drop the knife and stop.  Hagen did not comply with their numerous verbal commands.  Collins began to follow Hagen with his Taser drawn.  After running several feet, Hagen abruptly turned around and began running quickly at the officers with the knife in his right hand, raised up, and pointed at them.  Jarvis yelled to Collins to "leave it".  The "leave it" instruction was confusing and misunderstood.  (Collins Deposition Transcript at Page 124).

14. The officers continued to loudly and repeatedly yell at Hagen to stop and drop the knife, which he did not do.  Collins dropped his Taser and drew his weapon.  Jarvis observed the man crouch down, with his head up.  Jarvis fired his service weapon several times at Hagen.  Hagen fell to the pavement.  See (Memorandum Of Law In Support Of Joint Motion For Summary Judgment On Behalf Of All Defendants pages 3-5).  (See Jarvis Deposition Transcript.  See video tapes).

15.  A review of the officers body camera recordings reveal that Hagen was not walking with a "deliberate pace and look on his face" as the Defendants' allege, but rather was extremely unsteady on his feet, obviously injured as a large blood stain was visually apparent on the front of his shirt and he appeared to be dazed, disoriented and confused as was described by the eye witnesses at the accident scene.  (See Exhibit 1)  The officers did not know who was in charge.  (Jarvis Deposition Transcript at Page 42:1-8 and Page 123:12-13).

16. Additionally the officers' body camera recordings show that as the officers yelled at Hagen to stop and drop the knife he at one point stopped, looked behind him, looked back in the direction of the officers and then began to walk away from the officers, then he started to run for a few steps and as he turned back around in the direction of the

officers he tripped over his own feet and began to fall to the ground as the officers opened fire on him. See video. Hagen was very close to a 45° angle with the ground, a position he could not have regained his balance from, when the officers fired their first shots. The majority of the officers' remaining shots were fired after Hagen was already face down on the pavement. He was shot in the back and upper shoulder. (See Autopsy).

17. The officer's body camera recordings do not show Hagen with the knife in a raised position, or with his head up and his knife pointed at them as he ran quickly at them. See video. Hagen was not running at the officers when Officer Jarvis fired his service weapon, nor was Hagen 10 to 15 feet away from the officers when the first shots were fired as the Defendants allege. See (Body camera recordings of Officers Jarvis and Collins).

18. Additionally the Plaintiff's expert witness, Carl Lakowicz, of Northpoint Collision Consultants, LLP, has reviewed the New Hampshire Attorney General's Report, documents, photographs, newspaper articles, legal pleadings, digital files, the officers' body camera recordings, visited the scene of the accident and shooting and has prepared a preliminary analysis report regarding the above-captioned matter. Mr. Lakowicz indicates that:

"the body cam videos from both officers clearly shows Mr. Esty-Lennon with a small pocket knife that was held in his hand in a non-threatening manner no closer than 20 feet away. It was readily apparent Mr. Esty-Lennon was obviously confused, and visually staggering and off balance when first encountered. Neither body cam video shows that any of Mr. Esty-Lennon's movements justified the use of deadly force. The autopsy shows that Mr. Esty-Lennon was shot in the back, the back of the shoulder, and in the head. The bullet entry points clearly demonstrate the Mr. Esty-Lennon was not in a forward thrusting position when shot. Rather, he was nearly prone face down to the road surface as the first rounds were fired and on the road when the last rounds were fired, striking Mr. Esty-Lennon in areas disclosed during the autopsy that demonstrate he was

not lunging at the officers when the shots were fired." See (attached Preliminary Analysis, page 2 of 5 and 3 of 5).

19. Mr. Lakowicz goes on to state that:

"there was clear and obvious escalating confusion between Officer Jarvis and Officer Collins as this situation continued to develop.  Officer Jarvis had drawn his service weapon to point shoulder and quickly shouting at Mr. Esty-Lennon, ordering him to drop the knife.  It was abundantly clear in the videos that Mr. Esty-Lennon was not acting normally and was not responding to either officer.  Officer Collins, on the other hand, was noted to have appropriately deployed his Taser, a non-lethal, but nonetheless very affective compliance tool when it was appropriate to have done so.  However, once in position alongside Officer Jarvis was told by Officer Jarvis to 'leave it.' Officer Collins, instead of re-holstering the Taser, wrongly interpreted the order and dropped the Taser on the road, in essence giving up possession and control of this non-lethal, but incapacitating weapon. Mr. Esty-Lennon was suffering from a knife wound to the chest, was bleeding, and more likely than not, going into, or already in shock all after walking up a hill a quarter of a mile to where the officers would ultimately engage him." See (attached Preliminary Analysis, page 3 of 5).

20. Mr. Lakowicz further explains in his report that:

"No firearm was found to have been displayed by Mr. Esty-Lennon in either video, nor has been a suggestion that he had any firearm.  There was no outward physically aggressive act or verbal threat(s) toward the officers that justified the use of deadly force.  The officers clearly maintained a safe distance as Mr. Esty-Lennon was moving toward them or retreating.  The officers should have considered all of these circumstances created more negotiation space, space that was available, and acted more cautiously.

The shooting was not reasonable under those circumstances.  Instead of holding their ground after running after Mr. Esty-Lennon, the officers should have tactfully withdrawn back to at least their original positions and used both Tasers as necessary to incapacitate Mr. Esty-Lennon instead of abandoning an already deployed Taser in favor of a second service weapon when Mr. Esty-Lennon was already covered by Officer Jarvis.

The officers had ample time and opportunity, to not only distance themselves from Mr. Esty-Lennon, but had ample time and distance to maintain a sustained safe distance, but instead intentionally chose to shoot an obviously confused and injured man.  Regarding the Taser, Officer Jarvis shouted at Officer Collins to 'leave it,' which according to the Attorney General's Report he interpreted to mean his Taser.  As a result, Officer Collins dropped his Taser to the road and deployed his service pistol along with Officer Jarvis.  As Mr. Esty-Lennon turned on the hill grade to face the officers he lost his balance, tripped and began to fall forward with his hands and arms underneath him.  On officer opened fire, followed by the other.  A total of 10 shots were fired, 6 striking Mr. Esty-Lennon; fatally wounding him without adequate provocation.  It is my opinion that the

> Defendants unreasonably, or with deliberate indifference and callous disregard of Mr. Esty-Lennon's rights, deprived him of his civil rights and his right to equal protection of the law, and while acting under the color of the law, committed an improper search and seizure of his person and impeded his right to due process of justice in violation of the New Hampshire Constitution, State Law and Federal Law."

See (Preliminary Analysis, pages 3 of 5 through 5 of 5 attached hereto as Exhibit 8).

21. While expert testimony is not technically relied upon for summary judgment, the report illustrates the facts in disputed here.

## CONSTITUTIONAL VIOLATION

22. An officer generally may not use deadly force defensively or to prevent escape unless a "reasonable officer [in the same circumstances] would believe that [an individual] posed a 'threat of serious physical harm either to the officer or others.'" See Young v. City of Providence, 404 F.3d at 23 (1st Cir. 2005) (citation omitted). Relying on the Defendants' version of events, viewed in the light most favorable to the Plaintiff, a jury could determine that a reasonable officer in the position of Jarvis and Collins would not have perceived Hagen as presenting a "threat of serious harm" to Jarvis and Collins. Cf. id. At 22-23 (noting that, where officers mistakenly used deadly force against an off-duty officer, jury could have found officers' misidentification or haste unreasonable).

23. Given this evidence, a reasonable jury could surmise that a reasonable officer in Jarvis' or Collins' position would have realized he had ample time to step out of Hagen's way, retreat and reestablish his position and that Hagen therefore did not pose a threat of serious harm to them. See Abraham v. Raso, 183 F.3d 279, 294 (2d Cir. 1999) (holding in the alternative that, where officer used deadly force against approaching driver, officer's opportunity to get out of way and uncertainty as to speed of the vehicle, inter

alia, created jury question as to reasonableness of officer's conduct); <u>Acosta v. City & Cty. of San Francisco</u>, 83 F.3d 1143, 1146 (9th Cir. 1996), <u>as amended</u> (June 18, 1996) ("On the basis of the evidence presented at trial, the jury could have reasonably concluded that a reasonable officer . . . would have recognized that he could avoid being injured when the car moved slowly, by simply stepping to the side." <u>Cowan ex rel. Estate of Cooper v. Breen</u>, 352 F.3d 756, 763-64 (2d Cir. 2003) (holding officer's use of deadly force against driver would be unreasonable if, inter alia, driver's vehicle was moving slowly and officer was not in vehicle's path, or if officer could have gotten out of the way).

24. A jury could likewise conclude that a reasonable officer would not believe that Hagen posed a threat to other officers on the scene or to the public. As for potential danger to the public, a reasonable jury could conclude that none of the facts known to Jarvis and Collins suggested that Hagen posed an imminent threat.  In fact other responders at the scene had previously determined that Hagen was not an "immediate threat."  <u>See</u> Exhibit 1.  Jarvis and Collins knew, for instance, that Hagen had been in a car accident, was injured, and walked away from the scene with a small pocket knife, but that kind of conduct stands in stark contrast to the conduct typically justifying the use of deadly force against a fleeing suspect, <u>see</u> <u>Scott v. Harris</u> 550 U.S. 372, 382 (2007) ([f]leeing suspect "rac[ed] down narrow, two lane roads in the dead of night at speeds that [were] shockingly fast, . . . swerve[d] around more than a dozen cars traveling in both directions. . . to avoid being hit"); <u>Plumhoff v. Rickard</u>, 134 S. Ct. at 2021, 2020 (2014).

**IMMUNITY**

25. It was not reasonable for Officers Jarvis and Collins to use deadline force in this situation. In the context of immunity, "objective reasonableness" is considered "from the perspective of the actor in question." Farrelly v. City of Concord, 168 N.H. 430, 447 (2015). Given the specific facts and circumstances that the officers faced in this situation, it was not objectively nor subjectively reasonable for them to use deadly force against Hagen Esty-Lennon.

26. To overcome Jarvis and Collins' qualified immunity defense, and the New Hampshire State immunity claims, Esty must show that Jarvis and Collins "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." See Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). The First Circuit has explained that there are two aspects to this inquiry: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Stamps v. Town of Framingham, 813 F.3d 27, 34 (1st Cir. 2016) (quoting Mlodzinski v. Lewis, 648, F.3d 24, 32 (1st Cir. 2011)). Here the shooting of an unarmed victim constitutes the alleged constitutional violation.

27. A Fourth Amendment excessive force claim requires proof that "the defendant officer employed force that was unreasonable under the circumstances." McGrath, 757 F.3d at 25 (quoting Kenney v. Floyd, 700 F.3d 604, 609 (1st Cir. 2012)). In general, an officer may not use deadly force defensively or to prevent escape unless a "reasonable officer [in the same circumstances] would believe that [an individual] posed a 'threat of serious

physical harm either to the officer or others.'" See Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 23 (1st Cir. 2005) (quoting Tennessee v. Garner, 471 U.S. 1, 12 (1985)). But general rules only go so far. In assessing the reasonableness of an officer's conduct, courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Plumhoff v. Rickard, 134 S. Ct. 2012, 2020 (2014) (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). They must take into account the "totality of circumstances," Garner, 471 at 9, and "slosh [their] way through the factbound morass of 'reasonableness,'" Scott v. Harris, 550 U.S. 372, 383 (2007). See generally Rand v. Lavoie, Case No. 14-cv-570-PB (U.S. District Court District of NH) (Opinion No. 2017 DNH 177).

28. The Fourth Amendment's reasonableness test is objective: it focuses on how a "reasonable officer on the scene" would act, rather than an officer's actual state of mind. See McGrath, 757 F.3d at 25 (quoting Kenney, 700 F.3d at 609)). Crucially, courts must avoid analyzing an officer's conduct "with the 20/20 vision of hindsight" and should be mindful that "police officer are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97; Rand v. Lavoie, Case No. 14-cv-570-PB.

29. In determining whether a constitutional right is clearly established, "[w]e ask (a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right." Stamps, 813 F.3d at 34 (quoting Mlodzinski, 648 F.3d at 32-

33).  Although Esty need not provide a "case directly on point" to pierce qualified immunity, "existing precedent must have placed the statutory or constitutional question beyond debate."  Mulleniz, 136 S. Ct. At 308 (quoting al-Kidd, 563 U.S. at 741).  This requires either "controlling authority or a robust consensus of cases of persuasive authority."  Plumhoff, 134 S. Ct. At 2023 (citation and internal quotation marks omitted) (dictum); Rand v. Lavoie, Case No. 14-cv-570-PB.

30. Furthermore, the Supreme Court has stressed that courts cannot define a clearly established right "as a high level of generality," but instead must determine "whether the violative nature of particular conduct is clearly established."  Mulleniz, 136 S. Ct. At 308 (citation omitted); see also White v. Pauly, 137 S. Ct. 548, 552 (2017) (emphasis added).  In other words, an act's "unlawfulness must be apparent."  White, 137 S. Ct. At 552 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  A right described "at a high level of generality" will suffice only in an obvious case."  Id.  At 552 (quoting Brosseau v. Haugen, 543 U.S. 194, 199 (2004) (per Curiam)).  See Here this shooting can be viewed as reckless and unreasonable.

**DEFENDANTS' REQUEST FOR SUMMARY JUDGMENT IS UNFOUNDED**

31. Defendants come before this Court and argue that they are protected from Plaintiff's claims due to immunity (RSA 627:1 &:5 Immunity; RSA 507-B Immunity; Official Immunity; Vicarious Official Immunity).  Those claims are disingenuous and premature.

32. New Hampshire's official immunity statute provides state officer with immunity against suits "arising from acts committed within the scope of their official duty while in the course of their employment for the state and not in a wanton or reckless manner."  N.H.

Rev. Stat. Ann. § 99-D:1.  When the claims involved are for intentional torts like battery, the New Hampshire Supreme Court has held that officers are entitled to official immunity only if the (1) "subjectively Believed that [their] conduct was lawful" and (2) they did not objectively act "recklessly or wantonly as to the lawfulness of their conduct."  Farrelly v. city of Concord, 168 N.H. 430, 444-46 (2015).  Facts in dispute here overcome this hurdle.

33. New Hampshire law permits police officer to use deadly force under only two circumstances.  An officer may use deadly force "when he reasonably believes such force is necessary . . . [t]o defend himself or a third person from what he reasonably believes is the imminent use of deadly force."  N.H. Rev. Stat. Ann. § 627:5 (II) 9a).  Deadly force may also be used "when [the officer] reasonably believes such force is necessary . . . [t]o effect an arrest or prevent the escape from custody of a person whom he reasonable believes . . [h]as committed or is committing a felony involving the use of force or violence, is using a deadly weapon in attempting to escape, or otherwise indicates that he is likely to seriously endanger human life or inflict serious bodily injury unless apprehended without delay" § 627:5 (II)(b).  The officers themselves have indicated that Hagen was not committing any crime either before or when they encountered him.

34. Summary Judgment on the basis of official immunity is not appropriate in the case at bar.  Even assuming that Jarvis and Collins believed in the lawfulness of their actions, a jury could conclude that they acted recklessly or wantonly.

35. Among other things, the officers again failed to obtain readily available information as to Hagen's accident, condition, and prior assessment of being "not a risk."

36. The officers failed to de-escalate the situation, failed to consider his possible head injury

and mental state.

37. The officers failed to pause, back up and use the cars as a shield, failed to confer on who was in charge.

38. The officers were confused the command used as to "leave it" resulting in the tazer being unused, abandoned and left on the ground and that confusion resulted in the shooting death of Hagen.

39. Hagen had given his license to the first responder.  See Exhibit 9.

40. Hagen had camping gear, hatchet, machete and other gear in his truck.  See photos attached as Exhibit 7.

## OTHER CLAIMS

41. The conspiracy, negligent supervision, excessive force and other claims all boil down to the same factual disputes.  Here there are facts in dispute as to the "reasonableness" or "recklessness" of what occurred.

42. In the summary judgment context, these claims should not be dismissed.  An evidentiary hearing is needed as to the "reasonableness" of the officers actions.

43. The immunity claims require an evidentiary hearing also.

44. In order to consider these motions the Court must review the video and the officers should testify at an evidentiary hearing with witnesses..

45. Accordingly, the Defendants' Joint Motion For Summary Judgment On Behalf Of All Defendants' must be denied.

WHEREFORE, the Plaintiff, by and through counsel, respectfully prays this Honorable

Court:

    A.  Accept and consider this Objection;

    B.  Deny the Defendant's <u>Joint Motion For Summary Judgment On Behalf Of All Defendants</u>;

    C.  In the alternative, hold a Hearing with a record on this matter; and

    D.  Such further relief as this Honorable Court deems necessary.

Dated:  November 6, 2017　　　　　　　Respectfully submitted,

Donna Esty, Individually, and
Donna Esty for the Estate of
Hagen Esty-Lennon


By their Counsel
McGRATH LAW FIRM, P.A.
20 Montgomery Street
Concord, NH 03301
(603) 224-7111

/s/ Peter G. McGrath
_____
Peter G. McGrath, Esq. - No. 5564


CERTIFICATE OF SERVICE

    I certify that a copy of this motion has this day been forwarded in accordance with EFC Rules to:

Charles P. Bauer, Esq. -  bauer@gcglaw.com
Brian J.S. Cullen, Esq. -  bcullen@cullencollimore.com


Dated:  November 6, 2017　　　　　　　/s/ Peter G. McGrath
　　　　　　　　　　　　　　　　　　　　Peter G. McGrath, Esq.

18