**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>Donna Esty, individually and as</u>
<u>Administratrix of the Estate of</u>
<u>Hagen Esty-Lennon</u>

      v.                              Civil No. 17-cv-59-AJ
                                         Opinion No. 2018 DNH 115

<u>Town of Haverhill, et al.</u>

**<u>MEMORANDUM ORDER</u>**

Donna Esty brings this action individually and on behalf of
the estate of her son, Hagen Esty-Lennon, who was shot and
killed by two Haverhill police officers in July 2015. She
alleges violations of federal and state law by the Town of
Haverhill and the two officers. The defendants jointly move for
summary judgment (doc. no. 18), and Esty objects (doc. no. 23).
There are also four non-dispositive motions pending before the
court related to the timeliness of Esty's expert disclosure and
whether the court may properly consider materials attached to or
referenced in Esty's objection to the motion for summary
judgment. See doc. nos. 20, 21, 28, and 33.

As discussed below, the court is not persuaded by Esty's
arguments with respect to the non-dispositive motions. The

court ultimately need not resolve those motions, however,

because even if the challenged materials were properly before

the court, the defendants would still be entitled to summary

judgment on Esty's federal claims.  The court accordingly grants

the defendants' motion as to those claims.  In an abundance of

caution, the court declines supplemental jurisdiction over

Esty's state-law claims and remands them to state court.  The

court denies all other motions as moot.


## I.   <u>PROCEDURAL HISTORY</u>

The court starts by summarizing the travel of this case, as

it has some bearing on both the non-dispositive motions and the

motion for summary judgment.  Esty initially brought this action

in state court, alleging that the Haverhill Police Department,

the Grafton County Sheriff's Department, the two officers

involved in the shooting, and a third Haverhill officer violated

state and federal law.  <u>See</u> doc. no. 1-2.  The defendants

removed the action to this court based on the federal claims

(doc. no. 1), and the parties consented to the jurisdiction of

the undersigned magistrate judge.[1]

_____

[1] As best the court can tell, neither side filed a consent form
as directed by the Clerk of Court.  <u>See</u> doc. no. 4 (notice of
assignment to magistrate judge); Mar. 7, 2017 Docket Entry
(instructing the removing defendants to file a consent form on

Once removed, Esty moved to non-suit the Grafton County Sheriff's Department (doc. no. 3) and to substitute the Town of Haverhill for the Haverhill Police Department (doc. no. 11). She then amended her complaint, dropping the third Haverhill officer as a defendant. See doc. no. 14. In its current form, Esty's action comprises nine counts — three federal and six state — brought against some combination of the Town and the two officers involved in the shooting. See id.

The court held a preliminary pretrial conference on March 27, 2017. See March 27, 2017 Minute Entry. Attorney James Laura represented Esty at that conference. See id. Following the conference, the court issued a scheduling order. See doc. no. 12. Consistent with the discussion at the conference, the court set a July 5, 2017 deadline for Esty to disclose experts and provide expert reports to the defendants. See id. at 1. This deadline was four days after the deadline proposed by the parties in their joint discovery plan. See doc. no. 10 at 4

_____

or before the deadline for filing a discovery plan). Consent may nevertheless be inferred in this case, as the parties did not refuse consent despite being informed that they could do so, see doc. no. 4 at 1, and both sides voluntarily appeared and litigated this matter before the undersigned magistrate judge, see Roell v. Withrow, 538 U.S. 580, 590 (2003) (consent can be inferred when "the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared . . . before the Magistrate Judge" (emphasis added)).

(proposing July 1, 2017). The court set an October 2, 2017 deadline for the defendants to make corresponding disclosures. See doc. no. 12 at 1. The court further set a November 15, 2017 summary-judgment deadline and a January 16, 2018 discovery deadline, consistent with the parties' proposals in their discovery plan. See id. at 1; doc. no. 10 at 3, 5.

On October 6, 2017, the defendants jointly moved for summary judgment. Doc. no. 18. A little more than two weeks later, Esty moved to extend the deadlines for the parties to exchange expert reports. Doc. no. 20. Esty indicated in her motion that she had forwarded the defendants a copy of her expert reports on that same date. Id. ¶ 6. The defendants objected to Esty's motion to extend (doc. no. 22) and jointly moved to exclude Esty's experts (doc. no. 21). Esty did not object to the motion to exclude.

On November 6, 2017, Esty filed an objection to the motion for summary judgment. See doc. no. 23. She attached eight exhibits to her objection. See doc. nos. 23-2 through 23-9. The defendants jointly moved to strike several of those exhibits, as well as references in Esty's objection to evidence not before the court, contending that they were not admissible, as required by Rule 56, or were otherwise not relevant. See doc. no. 28. Esty objected to the motion to strike. Doc. no.

30.

On November 9, 2017, the defendants filed a statement on the status of discovery, as required by the scheduling order. See doc. no. 26. In that statement, the defendants represented that they did not believe a discovery-status conference was necessary. Id. ¶ 9. Esty assented to the defendants' statement later the same day without raising any concerns about the status of discovery or of the case in general. See doc. no. 27.

The court heard oral argument on all of the pending motions on December 6 and 7, 2017. Attorney Peter McGrath represented Esty at that hearing. Following the hearing, Esty sought leave to addend her objection to the motion for summary judgment to attach an affidavit in support of one of her expert reports. See doc. no. 33. The defendants objected to that motion. See doc. no. 34.

## II.  NON-DISPOSITIVE MOTIONS

The court turns first to the non-dispositive motions. These motions present two distinct issues: (1) whether Esty's late disclosure of her experts was justified or excusable; and (2) whether Esty has properly supported the materials attached to or referenced in her objection to the motion for summary judgment. The court addresses each issue in turn.

**A.   Expert Disclosures**

The first two non-dispositive motions — Esty's motion to extend and the defendants' motion to exclude — both address Esty's attempt to disclose experts three-and-a-half months after her deadline to do so expired.  Though different standards apply to each motion, with the motion to extend requiring a showing of "good cause" under Rule 16(b)(4) and the motion to exclude analyzed under Rule 37(c)(1)'s "substantially justified or harmless" standard, Esty bears the burden under either.  See Somascan, Inc. v. Philips Med. Sys. Nederland, B.V., 714 F.3d 62, 64 (1st Cir. 2013) (Rule 16(b)(4)); Wilson v. Bradlees of New England, Inc., 250 F.3d 10, 21 (1st Cir. 2001) (Rule 37(c)(1)).

Esty raises several arguments in support of her late disclosure.  First, she suggests that she could not disclose her experts by July 5, 2017, because certain written discovery was outstanding at that time and additional non-party depositions still needed to be scheduled.  Next, she argues that an extension would not prejudice either side, as the defendants also failed to disclose an expert and her proposal extends their deadline as well.  Third, Esty contends that the defendants should have been aware that she would seek to disclose an expert because she mentioned experts in her demand letter.  Next, Esty

contended at the hearing that she needed an expert to prove her case.[2]  Esty's counsel also acknowledged for the first time at the hearing that he missed the July 5, 2017 deadline due to "confusion" at his office, which he attributed both to his secretary and Attorney Laura, and suggested that if the court were inclined to sanction him, awarding the defendants attorney's fees would be more appropriate than precluding the experts outright.

In response, the defendants contend that Esty has provided no justification for her failure to timely disclose her experts. The defendants note that they did not receive discovery requests from Esty until August 2017, which they argue undermines any claim that her failure to disclose experts by the July 5, 2017 deadline was due to outstanding discovery.  They next argue that the demand letter does not constitute a proper expert disclosure under Rule 26, and therefore does not excuse the late disclosure.  The defendants also reject Esty's contention that they will not be prejudiced by her late disclosure, noting that they decided against disclosing their own expert and elected to

---

[2] Esty's counsel offered conflicting arguments on this point, initially refusing to commit to whether the court must consider the expert report for the purposes of summary judgment, but later suggesting that the case would be "caput" without an expert.

file their motion for summary judgment relying on the fact Esty had not disclosed an expert. Finally, the defendants dispute any suggestion that excluding Esty's expert would result in the dismissal of her action, contending that her expert report is irrelevant to the court's summary judgment analysis.

The court ultimately need not resolve whether Esty has met her burden under Rule 16(b)(4) or 37(c)(1), as the defendants would be entitled to summary judgment on the federal claims even if Esty had properly disclosed her experts. The court nevertheless emphasizes that it does not find Esty's arguments to be particularly persuasive, especially given that she assented to the defendants' November 9, 2017 statement on the status of discovery without raising any of the issues that she now argues caused the late expert disclosure. See doc. nos. 26, 27.

B.  **Exhibits**

The other two non-dispositive motions relate to materials attached to or referenced in Esty's objection to the motion for summary judgment. The defendants move to strike several of those exhibits and references, arguing that they are not admissible, as required by Rule 56(c), or are otherwise irrelevant to the issues raised in the motion for summary judgment. Esty counters that the defendants' motion is

8

premature, as discovery had not closed at the time it was filed. To this end, Esty suggests, but does not request, that the court defer ruling on the motion under Rule 56(e) to allow her additional time to present her exhibits in admissible form.[3]

Esty further suggests in her objection, and reiterated at the hearing, that she does not need to submit affidavits in order to comply with Rule 56. Alternatively, Esty takes the position that the court still must deny the defendants' motion for summary judgment even if it granted their motion to strike.

It is well-established that "evidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment." Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir. 2005) (brackets and citations omitted). Rule 56(c) accordingly allows a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Furthermore, when an affidavit or declaration is used to support a fact, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

---

[3] Esty's attorney repeatedly raised similar suggestions at the hearing, but when pressed by the court, steadfastly refused to take a position on whether he was seeking affirmative relief under Rule 56(d) or 56(e).

Id. 56(c)(4).

The defendants' motion to strike is well-taken. Many of the documents attached to Esty's objection or otherwise referenced therein do not appear to be admissible in evidence. Moreover, Esty supports those documents solely through her counsel's affidavit, which does not (and very likely could not) demonstrate personal knowledge of the facts in question, let alone that counsel is competent to testify to those facts at trial. The court once again does not need to resolve the defendants' motion, however, as the defendants are entitled to summary judgment on the federal claims even if the court considers the materials attached to or referenced Esty's motion for summary judgment. For this reason, the court likewise need not reach the merits of Esty's motion for leave to file an addendum.

### III. <u>MOTION FOR SUMMARY JUDGMENT</u>

#### A. <u>Standard of Review</u>

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "If a nonmovant bears the ultimate burden of proof on a given issue, she must present 'definite,

competent evidence' sufficient to establish the elements of her claim in order to survive a motion for summary judgment." Pina v. Children's Place, 740 F.3d 785, 795-96 (1st Cir. 2014) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)). The court must "draw all reasonable inferences from the record in the light most favorable to the nonmoving party, disregarding any 'conclusory allegations, improbable inferences, or unsupported speculation.'" McGrath v. Tavares, 757 F.3d 20, 25 (1st Cir. 2014) (quoting Alicea v. Machete Music, 744 F.3d 773, 778 (1st Cir. 2014)).

**B.  Background**

The material facts appear to be largely undisputed.[4]  On July 6, 2015, Haverhill Police Officers Ryan Jarvis and Greg Collins were on duty at the Haverhill Police Department station when they were informed over the radio of a motor vehicle accident in Bath, New Hampshire.  Doc. no. 18-2 ¶ 1; doc. no. 18-9 ¶ 1.  The officers learned that the scene was unsecured and

---

[4] The parties do dispute the scope of material facts, with the defendants contending that the court should focus primarily on the shooting itself and Esty arguing that there are additional disputed facts leading up to the shooting that the court must consider.  As discussed infra pp. 23-24, the court largely agrees with the defendants that, regardless of whether they are disputed, these additional facts are not material to Esty's federal claims.  The court limits the present narrative accordingly.

11

that an individual had been involved in the accident and might
be armed with a knife.  Doc. no. 18-2 ¶ 1; doc. no. 18-9 ¶ 1.
The officers left the station in separate marked cruisers.  Doc.
no. 18-2 ¶ 2; doc. no. 18-9 ¶ 2.  Each officer activated his
emergency lights and siren.  Doc. no. 18-9 ¶ 2; doc. no. 18-2 ¶
2.  Officer Collins also activated his body camera while en
route.  Doc. no. 18-9 ¶ 2; see also doc. no. 18-10
(conventionally filed).  Officer Jarvis learned over his cruiser
radio that there was an individual walking away from the
accident with a potential stab wound in his chest.  Doc. no. 18-
2 ¶ 2.

Officer Collins arrived on the scene just ahead of Officer
Jarvis.  Doc. no. 18-9 ¶ 3; doc. no. 18-2 ¶ 3.  Officer Jarvis
activated his body camera as he exited his cruiser.  Doc. no.
18-2 ¶ 4; doc. no. 18-3 (conventionally filed).  The defendants
submitted footage from both officers' body cameras as
attachments to their motion for summary judgment.  See doc. nos.
18-3; 18-10.  While the parties dispute how these videos should
be interpreted, they agree that the videos accurately depict the
events immediately following the officers' arrival at the scene.
The following facts are accordingly drawn from the video
recordings unless otherwise noted.  Cf. Scott v. Harris, 550
U.S. 372, 380-81 (2007) (noting that when a party's version of

events is "blatantly contradicted" by a videotape, the court "should not rel[y] on such visible fiction," but rather "view the facts in the light depicted by the videotape").

When he arrived at the scene, Officer Collins pulled into the right breakdown lane and exited his vehicle. As he did so, a dark SUV approached in the breakdown lane on the other side of the road, and the driver — a Town of Bath firefighter who had responded to the accident (doc. no. 18-4 at 11; doc. no. 18-12 at 6) — raised his hand out the window and waved in Officer Collins's general direction. Officer Jarvis parked behind Officer Collins and exited his cruiser. As Officer Jarvis walked toward Officer Collins's cruiser, the dark SUV pulled into the center of the road, and the firefighter exited the SUV looking in Officer Jarvis's direction. Officer Jarvis briefly raised his hand in an apparent gesture toward the firefighter.

Officer Collins approached a man, later identified as Esty-Lennon, standing in the right breakdown lane. Esty-Lennon had a dark stain on his shirt and was carrying a short knife in his right hand. Officer Collins gestured at Esty-Lennon and asked him to approach. Esty-Lennon walked toward Officer Collins, who asked to see his hands. Esty-Lennon continued walking toward Officer Collins. Officer Collins pointed at Esty-Lennon and directed him to keep his hands out of his pockets. Esty-Lennon

did not respond and continued to walk deliberately in Officer Collins's direction.

Officer Collins stopped and told Esty-Lennon to "put that down." Esty kept approaching, and, approximately two seconds later, Officer Collins raised his firearm and shouted, "Put the knife down and stop – stop where you are!" Officer Jarvis, who was several paces behind Officer Collins, also raised his firearm and started to approach. Once he was level with Officer Collins, Officer Jarvis came to a stop, but continued to point his firearm at Esty-Lennon.

Esty-Lennon walked deliberately toward the officers with the knife in his hand. Both officers repeatedly ordered Esty-Lennon to put the knife down. Officer Jarvis made a partially inaudible comment to Officer Collins about his Taser, and Officer Collins lowered his right hand. Esty-Lennon stopped approaching the officers and turned to look over his shoulder. Both officers continued to order Esty-Lennon to drop the knife, with Officer Jarvis at one point exclaiming, "Drop the knife or I will shoot you!"

Esty-Lennon backpedaled, then turned and slowly ran away from the officers. Officer Collins lowered his firearm, said "cover," and started to pursue Esty-Lennon, holding his Taser in his right hand. Officer Jarvis lowered his firearm and followed

14

Officer Collins.  Esty-Lennon looked back over his shoulder, increased speed for a few seconds, looked back over his shoulder again, and abruptly turned toward the officers with the knife still in his hand.  As he did, Officer Jarvis stated "Greg, leave it!" and Officer Collins dropped his Taser.

Both officers started to backpedal as they raised their firearms.  Esty-Lennon ran several paces toward the officers, first in Officer Collins's direction, then toward Officer Jarvis, while still bearing the knife.  When he was only several feet away from the officers, Esty-Lennon staggered.  At that same instant, both officers opened fire, shooting Esty-Lennon several times.  Esty-Lennon ultimately died from his injuries.

## C.  **Discussion**

As noted, Esty's amended complaint consists of three federal claims and six state claims.  Esty brings federal claims against Officers Jarvis and Collins for "violation of civil rights" (Count 3) and unreasonable seizure (Count 5), and against the Town for unconstitutional municipal policies or customs (Count 6).[5]  She brings state-law claims against the Town

---

[5] Though Esty also brings Counts 3 and 5 against the Town, it is black-letter law that "[a] municipality cannot be held liable solely because it employs a tortfeasor," and that a plaintiff must instead show "that the violation occurred as a result of the municipality's 'policy or custom." Freeman v. Town of Hudson, 714 F.3d 29, 37-38 (1st Cir. 2013) (citations and

15

and both officers for wrongful death (Count 1), civil conspiracy (Count 2), and infliction of emotional distress (Count 4). Against the Town, Esty also brings state-law claims for negligent supervision and training (Count 7) and respondeat superior (Count 9). Finally, she brings a state-law battery claim against just the officers (Count 8).

The defendants move for summary judgment on all claims. With limited exception, Esty objects. The court turns first to the federal claims before addressing the state-law claims.

### 1. Violations of Civil Rights (Count 3)

The court first considers Count 3, Esty's claim for "violation of civil rights." In this count, Esty contends, without much elaboration, that the defendants "deprived [Esty-Lennon] of his right to equal protection" and "impeded his right to due process of justice . . . ." Doc. no. 14 ¶ 50. In their motion for summary judgment, the defendants construe Count 3 to allege an equal protection claim and argue that there is no genuine dispute of fact sufficient to sustain such a claim. Esty does not mention this claim in her objection and agreed at

---

emphasis omitted). Seemingly aware of this requirement, Esty brings Count 6 against the Town, alleging an unconstitutional policy or custom. <u>See</u> doc. no. 14 at 12-13. The court accordingly views the Town's inclusion in Counts 3 and 5 as superfluous, and analyzes those counts solely as brought against the officers.

the hearing to withdraw Count 3 to the extent it was based on
equal protection.  But in doing so, Esty suggested that she also
intended to allege a due-process claim as part of Count 3.  Esty
did not develop this suggestion at the hearing or otherwise
attempt to refute the defendants' construction of Count 3.

As Esty withdrew her equal protection claim, the court need
only address Count 3 to the extent it is based on due process.
The court is far from convinced that Count 3 states a viable
due-process claim.  But even assuming it does, Esty's counsel's
stray reference to due process at the hearing is not the sort of
developed legal argument the court need consider at this
juncture.  Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d
252, 260 (1st Cir. 1999) ("The district court is free to
disregard arguments that are not adequately developed . . . ."
(citation omitted)).  Even more importantly, Esty has not
pointed to any evidence in the record that might support
recovery under a due process theory.  See Foley v. Wells Fargo
Bank, N.A., 772 F.3d 63, 79 (1st Cir. 2014) (citation omitted)
("[I]n the summary judgment context . . . [judges] are not pigs
hunting for truffles in the record." (internal brackets and
quotation marks omitted)).  The defendants are therefore
entitled to summary judgment on Count 3 to the extent it is
based on due process.

**2.    Unreasonable Seizure (Count 5)**

In Count 5, Esty contends that Officer Collins and Officer Jarvis used excessive force in violation of the Fourth Amendment when they shot and killed Esty-Lennon.  The defendants move for summary judgment, arguing that the officers' use of force was justified under the circumstances.  Alternatively, the defendants argue that the officers are entitled to qualified immunity.  Esty counters that her excessive-force claim should be put to a jury.

    a.    Fourth Amendment

"A claim that a police officer used excessive force is governed by the Fourth Amendment's 'reasonableness' standard." Mitchell v. Miller, 790 F.3d 73, 77 (1st Cir. 2015) (internal quotation marks omitted) (quoting Plumhoff v. Rickard, 134 S. Ct. 2012, 2020 (2014)).  "The test for whether the use of deadly force is excessive is whether an objectively reasonable officer would believe that the suspect posed a 'threat of serious physical harm either to the officer or others.'" Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 23 (1st Cir. 2005) (quoting Tennessee v. Garner, 471 U.S. 1, 12 (1985)).  To determine whether an officer's actions were objectively reasonable, the court must "balance the nature and quality of the intrusion of the individual's Fourth Amendment interests

against the countervailing governmental interests at stake."
Mitchell, 790 F.3d at 77 (quotation marks omitted) (quoting
Plumhoff, 134 S. Ct. at 2020).  This is an objective analysis,
requiring the court to "analyze the totality of the
circumstances, taking the perspective of a reasonable officer on
the scene, rather than the 20/20 vision of hindsight."  Id.
(quotation marks and ellipsis omitted) (quoting Plumhoff, 134 S.
Ct. at 2020).  Courts must be mindful that "police officers are
often forced to make split-second judgments — in circumstances
that are tense, uncertain, and rapidly evolving — about the
amount of force that is necessary in a particular situation."
Graham v. Connor, 490 U.S. 386, 397 (1989).

    "Judgments about reasonableness are usually made by juries
in arguable cases, even if there is no dispute about what
happened . . . ."  Roy v. Inhabitants of City of Lewiston, 42
F.3d 691, 694 (1st Cir. 1994).  But "the Supreme Court's
standard of reasonableness is comparatively generous to the
police in cases where potential danger, emergency conditions or
other exigent circumstances are present."  Berube v. Conley, 506
F.3d 79, 83 (1st Cir. 2007) (citation omitted).  When
determining objective reasonableness in the context of a deadly
force claim, summary judgment is appropriate when a rational
jury "could not find that [the officer's] conduct was so

deficient that no reasonable officer could have made the same choice . . . ." Roy, 42 F.3d at 694.  Put differently, an officer is entitled to summary judgment when a jury could find that a reasonable officer could have made the same decision under the circumstances.  See Napier v. Town of Windham, 187 F.3d 177, 184 (1st Cir. 1999) (noting that a trial court applied the correct summary judgment standard when it "replaced the inartful phrasing of the standard applied in Roy with an equivalent standard that omitted the double negative").

A jury could find that a reasonable officer could have used deadly force against Esty-Lennon under the circumstances presented in this case.  Both officers were informed at the outset that there might be an individual at the scene of the accident armed with a knife.  When they arrived at the scene, both officers quickly made contact with Esty-Lennon, who had a small knife in his right hand.  The officers pointed their firearms at Esty-Lennon and repeatedly ordered him to put the knife down.  Rather than comply, Esty-Lennon took several steps toward the officers.  The officers continued to direct Esty-Lennon to put the knife down, with Officer Jarvis at one point exclaiming, "Drop the knife or I will shoot you!"  Esty-Lennon backpedaled, then turned and ran in the other direction.  When he did so, both officers lowered their firearms and pursued

20

Esty-Lennon, with Officer Collins holding a Taser in his right

hand.  Still holding the knife, Esty-Lennon increased speed,

looked over his shoulder, abruptly turned toward the officers,

and ran several steps in the officers' direction.  Backpedaling,

the officers opened fire on Esty-Lennon when he was only several

feet away, just as he started to stagger.  Even when viewed in

the light most favorable to Esty, these facts, which are not

disputed, demonstrate that both officers were presented with

"circumstances that [were] tense, uncertain, and rapidly

evolving" and were "forced to make split-second judgments."

Graham, 490 U.S. at 397.  The court cannot say that under the

circumstances, a reasonable jury could not find that a

reasonable officer could have made the same judgments as the

officers made here.[6]

    Esty's counsel essentially conceded as much at the hearing,

---

[6] Though Esty raises no such argument, other litigants have
criticized the standard applied here as requiring a plaintiff to
prove her substantive case in order to survive a motion for
summary judgment.  See Napier, 187 F.3d at 184.  This criticism
overstates a plaintiff's burden in an excessive force case.  To
survive a motion for summary judgment, a plaintiff need only
present a version of events, supported by materials of
evidentiary quality, that when taken as true would allow a jury
to find that no reasonable officer could use deadly force under
the circumstances.  This rarely will be the *only* version of
events in the record, and in such cases it will be up to the
jury to decide which version to accept.  With the video evidence
in this case, however, there is no version of events that would
allow a jury to find in Esty's favor.

noting that "other people could say [that the officers were] appropriate in shooting [Esty-Lennon]." Esty nevertheless raises a series of arguments as to why summary judgment is not warranted. First, she argues that the officers' actions leading up the shooting were unreasonable. To this end, she contends that the officers: (1) should have spoken to the firefighter driving the dark SUV, who would have informed them that Esty-Lennon appeared to be mentally ill; (2) should have known from Esty-Lennon's behavior that he was mentally ill; (3) should have known, or taken the time to determine, that Esty-Lennon was injured; (4) should have set up a perimeter rather than engage Esty-Lennon; and (5) should have tased Esty-Lennon or otherwise deescalated the situation. Esty further argues that Officer Collins should not have dropped his Taser when Officer Jarvis said, "Greg, leave it!" and that the officers should not have left the Taser on the ground. Esty's expert raises similar contentions in his report. See doc. no. 23-8.

Esty's view of "reasonableness" is far too narrow, at least for the purposes of an excessive-force claim. As noted, courts must analyze such claims from the perspective of a reasonable officer at the scene, not with the benefit of 20/20 hindsight. This means that "a jury does not automatically get to second-guess [an officer's] life and death decisions, even though the

plaintiff has an expert and a plausible claim that the situation could better have been handled differently." Roy, 42 F.3d at 695. As Esty seeks exactly that, her reasonableness arguments fail.

In a related argument, Esty asserts that there are genuine disputes about the events leading up to the shooting. She details interactions Esty-Lennon had with the firefighter and other potential witnesses following the crash but before the officers arrived at the scene, and contends that these facts preclude summary judgment. See doc. no. 23-1 at 2-6. The court disagrees. For Esty to defeat summary judgment, there must be a genuine dispute of *material* fact. See Fed. R. Civ. P. 56(a). "A 'material' fact is one that might affect the outcome of the suit under the governing law." Reyes-Orta v. P.R. Highway & Transp. Auth., 811 F.3d 67, 73 (1st Cir. 2016) (citations and quotation marks omitted). Here, Esty has not explained, and the court fails to see, how events occurring before the officers' arrival, and about which they had no knowledge at the time of the shooting, have any bearing on the outcome of this case. Indeed, the only plausible argument Esty makes with respect to those events is that the officers should have made themselves aware of them before engaging Esty-Lennon. But as previously discussed, this argument asks the court to use a level of

hindsight not permitted under controlling authority.  It is
therefore unavailing.

Perhaps recognizing this, Esty's counsel asserted at the
hearing that, as a practical matter, courts *do* use 20/20
hindsight in excessive force cases.  The court is not convinced.
Counsel has not identified any decision in which a court
performed the type of analysis he asks this court to perform,
and none of the cases counsel did cite at the hearing persuades
the court that such an analysis is appropriate.  The first,
which counsel recollected was a Puerto Rico decision, is a non-
binding Ninth Circuit opinion that subsequent Ninth Circuit
panels have noted was abrogated by the Supreme Court's decision
in Saucier v. Katz, 533 U.S. 194 (2001).  See Acosta v. City and
Cty. of S.F., 83 F.3d 1143 (9th Cir. 1996), abrogation
recognized by Hung Lam v. City of San Jose, 869 F.3d 1077, 1086
(9th Cir. 2017); see also Randall v. Williamson, 211 Fed. App'x
565 (9th Cir. 2006) (also recognizing the abrogation).  The
next, a Second Circuit decision also not binding on this court,
involved a factual dispute over whether a car was bearing down
on an officer at the time he opened fire, and is therefore
readily distinguishable from this case.  See Cowan ex rel.
Estate of Cooper v. Breen, 352 F.3d 756, 763–65 (2d Cir. 2003).
Finally, counsel's reference at the hearing to Pearson v.

Callahan, 555 U.S. 223 (2009), is similarly unhelpful, as that
case addressed whether the unlawfulness of an officer's conduct
was clearly established for qualified immunity purposes, not
whether an underlying constitutional violation had occurred.
See id. at 245.  In short, counsel has provided no support
whatsoever for his request that the court ignore binding
authority to rule in his client's favor.  The court declines to
do so.

Esty next argues that Esty-Lennon did not pose a threat of
serious harm to Officer Collins or Officer Jarvis because both
officers had ample opportunity to "step out of [Esty-Lennon's]
way, retreat and reestablish [their] position . . . ."  Doc. no.
23-1 ¶ 23.  She similarly contends that "a reasonable jury could
conclude that none of the facts known to Jarvis and Collins
suggested that [Esty-Lennon] posed an imminent threat."  Id. ¶
24.  She cites several cases in support of these propositions.
See id. ¶¶ 23-24 (citing Cowan, 352 F.3d at 763-64; Abraham v.
Raso, 183 F.3d 279, 294 (3d Cir. 1999); Acosta, 83 F.3d at
1146).  In those cases, however, there were no video recordings
of the relevant events, requiring the court to credit the non-
movant's version to the extent it was supported by competent

evidence.[7]  Here, there is direct video evidence of the shooting,
which the court may rely upon for the purposes of its analysis.
See Scott, 550 U.S. at 378-81.  And as previously discussed, the
court cannot conclude, in light of the circumstances depicted on
those recordings, that a jury could find that the officers' use
of force was objectively unreasonable.  See Berube, 506 F.3d at
83 (noting that the "calculus of reasonableness must [allow for]
police officers to make split second judgments" (internal
quotation marks omitted)).  As Esty's argument to the contrary
essentially ignores the videos, it is not persuasive.

Esty suggests in her objection, and argued at the hearing,
that the officers did not face a threat of serious harm because
the knife in this case was small.  This argument likewise fails.
While a knife's size may certainly be relevant when analyzing an
excessive force claim, see, e.g., Estate of Larsen ex rel.
Sturdivan v. Murr, 511 F.3d 1255, 1260 (10th Cir. 2008) (noting
that "the knife was a large weapon with a blade over a foot in
length rather than a mere pocket knife or razor blade"); cf.
Kisela v. Hughes, 138 S. Ct. 1148, 1150 (2018) (holding that an
officer was entitled to qualified immunity for shooting a woman

---

[7] Though surveillance footage is mentioned in one of the cited
cases, it is plain from that court's opinion that there was no
footage of the actual shooting.  See Abraham, 183 F.3d at 284.

who was "holding a large kitchen knife"), this does not preclude summary judgment in all cases involving smaller knives, see, e.g., Roy, 42 F.3d at 693 (plaintiff was shot when "carrying a steak knife in each hand"); cf. Wilson v. Miller, 650 F. App'x 676, 678 (11th Cir. 2016) (officer was entitled to qualified immunity when he believed decedent had a "small knife" in his left hand). Rather, a court must consider the totality of the circumstances to determine "whether an objectively reasonable officer would believe the suspect posed a threat of serious physical harm either to the officer or others." Young, 404 F.3d at 23 (citation and internal quotation marks omitted). Based on the video evidence in this case, an objectively reasonable officer could believe that, notwithstanding the size of the knife, Esty-Lennon posed a threat of serious physical harm to both officers. Esty's contrary argument once again disregards this evidence.[8]

Esty also appears to argue that her expert report creates a triable issue as to the reasonableness of the officers' conduct. The court disagrees. In addition to subjecting the officers' conduct to far greater scrutiny than controlling authority

_____

[8] The same is true of Esty's argument that Esty-Lennon's distance from the officers at the time of the shooting made their conduct unreasonable. The body-camera footage belies any suggestion that the officers shot Esty-Lennon from some great distance.

permits, the events described in the expert report are at times at odds with the video evidence. Moreover, the expert report repeatedly embraces the ultimate issue of the officers' reasonableness, which several courts have held is beyond the scope of expert testimony in excessive force cases. See M.H. v. Cty. of Alameda, No. 11-cv-02868-JST, 2015 WL 54400, at *2 (N.D. Cal. Jan. 2, 2015) (collecting cases). And in any event, nothing in the expert report persuades the court that a dispute of material fact exists such that this case should be put to a jury despite the body-camera footage. The expert report is therefore insufficient to defeat summary judgment on the excessive force claim.

Esty likens her expert report here to the expert reports in Rand v. Lavoie, 2017 DNH 177 (Barbadoro, J.). Though Rand is an important and instructive decision, it does not support Esty's position. In Rand, the parties disputed whether the decedent's car was moving at the time she was shot and, if so, whether the defendant officer nonetheless had enough time to get out of the way. See id. at 12-21. The plaintiff's expert reports highlighted and expounded upon these factual disputes. See id. Noting that there was no video evidence conclusively demonstrating the events at issue, see id. at 15, Judge Barbadoro relied in part on the expert reports to conclude that

there were triable issues of fact, see id. at 12-21. As there is conclusive video evidence in this case, however, Esty cannot ask this court to do the same. She thus attempts to use her expert to manufacture triable issues out of undisputed video evidence. Nothing in Rand supports this attempt, which fails for the reasons stated in the preceding paragraph.

Finally, Esty contends that Esty-Lennon's physical condition at the time of the shooting made the officers' conduct unreasonable. To this end, she asserts that Esty-Lennon was "extremely unsteady on his feet" and "appeared to be dazed, disoriented and confused . . . ." Doc. no. 23-1 ¶ 15. As these assertions are inconsistent with the video evidence, the court need not credit them. See Scott, 550 U.S. at 378-81.

Esty also asserts that Esty-Lennon was staggering when the officers shot him. When viewed in the light most favorable to Esty, the video evidence does support this assertion. This does not alter the court's analysis, however, as it is clear from the videos that Esty-Lennon staggered at virtually the same instant the officers opened fire. Thus, even crediting this assertion, the officers' decision to use deadly force was the sort of "split-second judgment" that the "calculus of reasonableness" accommodates in excessive force cases. See Berube, 506 F.3d at 83. The mere fact Esty-Lennon staggered, without more, does not

defeat summary judgment on the excessive force claim.

For all of these reasons, the defendants are entitled to summary judgment on the merits of Count 5.

### b. Qualified Immunity

The defendants contend that even if summary judgment were not appropriate on the merits of Esty's excessive force claim, Officer Collins and Officer Jarvis are still entitled to qualified immunity. Police officers "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" Dist. of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (citation omitted). Because the court need not consider both prongs of qualified immunity when one is dispositive, see Pearson, 555 U.S. at 237, and because analysis under the first prong would mirror the above analysis on the merits, the court solely addresses whether the unlawfulness of the officers' conduct was clearly established at that time. For the following reasons, the court concludes that it was not.

"Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." Wesby, 138 S. Ct. at 589 (citations and internal

quotation marks omitted).  Put differently, "existing law must have placed the constitutionality of the officer's conduct beyond debate."  Id. (citation and internal quotation marks omitted).  "This demanding standard protects all by the plainly incompetent or those who knowingly violate the law."  Id. (citation and internal quotation marks omitted).  Where, as here, the moving party raises a qualified immunity defense, the nonmoving party has the burden of showing that qualified immunity does not apply.  See Mitchell, 790 F.3d at 77 (second prong); cf. Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011).

To be clearly established, the legal principle at issue must be "settled law."  Wesby, 138 S. Ct. at 589 (citation omitted).  This requires "controlling authority or a robust consensus of cases of persuasive authority" demonstrating that a reasonable officer should have known his conduct was unlawful at the time it occurred.  See id. at 589-90 (citation and internal quotation marks omitted).  "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply."  Id. at 590 (citation omitted).  "Otherwise, the rule is not one that every reasonable official would know."  Id. (citation and internal quotation marks omitted).

This standard "also requires that the legal principle

clearly prohibit the officer's conduct in the particular

circumstances before him." Id. When determining whether an

officer violated clearly established law, courts must consider:

> (a) whether the legal contours of the right in question
> were sufficiently clear that a reasonable officer would
> have understood that what he or she was doing violated the
> right, and (b) whether in the particular factual context of
> the case, a reasonable officer would have understood that
> his or her conduct violated the right.

Fernandez Salicrup v. Figueroa-Sancha, 790 F.3d 312, 325-26 (1st

Cir. 2015) (brackets omitted) (quoting Mlodzinski v. Lewis, 648

F.3d 24, 32-33 (1st Cir. 2011)). The Supreme Court has stressed

that courts "must not define clearly established rights at a

high level of generality, since doing so avoids the crucial

question [of] whether the official acted reasonably in the

particular circumstances that he or she faced." Wesby, 138 S.

Ct. at 590 (citations and internal quotation marks omitted).

While "there can be the rare 'obvious case,' where the

unlawfulness of the officer's conduct is sufficiently clear even

though existing precedent does not address similar

circumstances . . . , a body of relevant case law is usually

necessary to clearly establish the answer . . . ." Id.

(citations and internal quotation marks omitted). In other

words, "[a] rule is too general if the unlawfulness of the

officer's conduct does not follow immediately from the

conclusion that the rule was firmly established." Id.
(citations, internal quotations, and brackets omitted).

Though Esty appears to recognize her burden under the
clearly established prong, see doc. no. 23-1 ¶¶ 26-30, she makes
little attempt in her objection to point the court to precedent
demonstrating that the officers violated Esty-Lennon's clearly
established rights. The few cases she does cite are not
helpful, as they address excessive force claims "at a high level
of generality." See Wesby, 138 S. Ct. at 590. And her reliance
on law-enforcement policy and state law similarly does not move
the ball, as the Supreme Court has made clear that in order to
defeat qualified immunity, the clearly established right must be
the federal right on which the claim for relief is based. See
Elder v. Holloway, 510 U.S. 510, 515 (1994) (citing Davis v.
Scherer, 468 U.S. 183, 193-96, 196 n.14 (1984)); see also Hill
v. Selsky, 487 F. Supp. 2d 340, 343 (W.D.N.Y. 2007) (citations
omitted) ("[T]he existence of qualified immunity does not depend
on whether the right in question was clearly established under
state law, but on whether the federal right giving rise to the
claim was clearly established at the time of the alleged
violation." (emphasis omitted)).

When pressed at the hearing, Esty's counsel conceded that
he "ha[dn't] specifically addressed exactly how each officer

would have been on notice" that his conduct violated the law.
Counsel nevertheless argued that <u>Cowan</u>, <u>Acosta</u>, and <u>Rand</u> clearly
establish the right in question.  The court disagrees.  None of
these decisions is binding on this court, and the court is hard
pressed to conclude that three cases — one of which has been
expressly abrogated — constitute a "robust consensus of cases of
persuasive authority." <u>Wesby</u>, 138 S. Ct. at 589-90.  But even
if they did, each of these decisions is readily distinguishable
from the present case: unlike here, there is no suggestion in
<u>Acosta</u> that the subject of the shooting was armed with a knife
or any other weapon or was approaching the officers when he was
killed, <u>see</u> 83 F.3d at 1144, and as previously noted, <u>Cowan</u> and
<u>Rand</u> both involved factual disputes as to whether the decedents
were driving at the officers at the time they were shot, <u>see</u>
<u>Cowan</u>, 352 F.3d at 763-65; <u>Rand</u>, 2017 DNH 177, 12-21.[9]  Thus,
<u>Cowan</u>, <u>Acosta</u>, and <u>Rand</u> do not clearly establish that the
officers' conduct *in this case* was unlawful.

    At the hearing, Esty's counsel appeared to suggest that
this was the rare "obvious case" in which a non-movant can
defeat qualified immunity without identifying precedent that

---

    [9] Esty's reliance on <u>Rand</u> is further misplaced because it
was decided in September 2017, more than two years after the
conduct at issue here occurred.

addresses similar circumstances.  As counsel did not develop this argument, and at times seemed to back away from it, the court is free to disregard it.  See Higgins, 194 F.3d at 260. The court nonetheless has three observations with respect to obviousness.

First, counsel's suggestion that this is an obvious case because Esty-Lennon did not have a gun is a nonstarter.  There is no categorical rule that officers may not use deadly force on individuals armed only with knives.  Rather, courts must analyze the totality of the circumstances in each particular case.  In doing so, numerous courts have found that officers who shot individuals armed only with knives were entitled to qualified immunity.  See, e.g., Kisela, 138 S. Ct. at 1150; City & Cty. of S.F., Calif. v. Sheehan, 135 S. Ct. 1765, 1770 (2015); Roy, 42 F.3d at 693.  Any suggestion to the contrary is simply incorrect.[10]

Second, nothing in Young v. City of Providence ex rel. Napolitano makes this an obvious case.  Young involved two

_____

[10] So, too, is Esty's suggestion that the size of the knife makes this an obvious case.  The court has already discussed the knife's size in the context of the underlying violation.  See supra pp. 26-27.  But it is worth emphasizing here that it is far from obvious that an officer cannot use deadly force on an individual who runs toward him with a knife merely because that knife is small.  Cf. Roy, 42 F.3d at 693; Wilson, 650 F. App'x at 678.

Providence police officers shooting a third, off-duty officer when responding to a call.  See 404 F.3d at 9.  These facts bear little resemblance to the undisputed facts in the record here. Thus, Young in no way suggests that either officer's conduct in this case was obviously unlawful.

Finally, Esty may not rely on the Supreme Court's landmark decision in Tennessee v. Garner to argue that this is an obvious case.  The Supreme Court has admonished courts not to rely too heavily on "Garner's general test for excessive force," particularly in cases that are not on all fours with the facts presented there.  See Mullenix v. Luna, 136 S. Ct. 305 (2015) (per curiam); Brosseau v. Haugen, 543 U.S. 194, 199 (2004) (per curiam).  In Garner, the Supreme Court held that it was unconstitutional to use deadly force to prevent an unarmed suspect from escaping.  471 U.S. at 11.  It is clear from the video evidence here that Esty-Lennon was neither unarmed nor trying to escape when the officers shot him.  Accordingly, Garner does not support a conclusion that this is an obvious case.

In short, Esty has not demonstrated that either officer violated Esty-Lennon's clearly established rights.  The officers are therefore entitled to qualified immunity on Count 6.

c.    <u>Summary</u>

In sum, a reasonable jury could find, based on the undisputed video evidence, that a reasonable officer could have used deadly force under the circumstances presented in this case.  Additionally, both officers are entitled to qualified immunity.  For these reasons, the court grants the defendants' motion for summary judgment on Count 5.

**3.    Municipal Policy or Custom (Count 6)**

In Count 6, Esty brings a § 1983 claim against the Town, contending that the shooting was the result of an unconstitutional municipal policy or custom.  This type of claim is governed by the Supreme Court's decision in Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658 (1978).  Under that decision, a municipality may only be held liable under § 1983 for constitutional violations committed by its employees "if the violation occurs pursuant to an official policy or custom." Welch v. Ciampa, 542 F.3d 927, 941 (1st Cir. 2008) (citing Monell, 436 U.S. at 694).  For a municipality to be held liable, a plaintiff's injury must result "from either an officially sanctioned policy or from a custom or practice that is so well-settled and widespread that the policymaking officials can be said to have either actual or constructive knowledge of it yet did nothing to end the practice."  Wood v. Hancock Cty.

Sheriff's Dep't, 354 F.3d 57, 64 (1st Cir. 2003) (ellipsis,
internal quotation marks, and citation omitted).  A plaintiff
must show that, "through its deliberate conduct, the
municipality was the 'moving force' behind the injury alleged."
Haley v. City of Boston, 657 F.3d 39, 51 (1st Cir. 2011)
(emphasis and citation omitted).

The defendants raise two arguments as to why they are
entitled to summary judgment on Count 6.  First, they contend
that Esty's Monell claim fails because "there has been no
deprivation of a constitutional right."  Doc. no. 18-1 at 22.
Alternatively, the defendants argue that "there is no evidence
of an unconstitutional policy or practice that led to the use of
deadly force in this case . . . ."  Id.  The court need not
reach both arguments, as summary judgment is appropriate under
the first.

A municipality "cannot be held liable [under § 1983] absent
a constitutional violation by its officers."  Evans v. Avery,
100 F.3d 1033, 1040 (1st Cir. 1996); see also City of L.A. v.
Heller, 475 U.S. 796, 799 (1986) ("If a person has suffered no
constitutional injury at the hands of the individual police
officer, the fact that the departmental regulations might have
authorized the use of constitutionally excessive force is quite
beside the point." (emphasis omitted)).  In this case, Esty

withdrew her equal-protection claim and the court ruled that the
defendants were entitled to summary judgment on the merits of
Esty's due-process and excessive force claims.  There is
accordingly no underlying constitutional violation upon which
municipal liability can be based.

When construed liberally, Esty's amended complaint appears
to suggest that various alleged failures by the Town provide an
independent basis for municipal liability.  See doc. no. 14 ¶
62.  The First Circuit rejected a similar argument in Evans, see
100 F.3d at 1039–40, and Esty has made no attempt to
differentiate that case.  Indeed, Esty does not address her
Monell claim at all in her objection.  The court therefore
concludes that Evans controls.  Per that decision, Esty's Monell
claim cannot survive without an underlying constitutional
violation.

The court accordingly grants the defendants' motion for
summary judgment as to Count 6.

**4.    State-Law Claims**

The remaining counts are state-law claims against the
officers or the Town for wrongful death, civil conspiracy,
infliction of emotional distress, negligent supervision and
training, respondeat superior, and battery.  At the hearing, all
sides requested that the court address the state-law claims on

39

summary judgment.  After careful review, the court declines to do so, concluding that it is more appropriate to remand them to state court.

The sole basis for this court's jurisdiction over the state-law claims is supplemental jurisdiction under 28 U.S.C. § 1367.  In light of the above rulings, however, there are no longer any federal claims in this case.  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  Wilber v. Curtis, 872 F.3d 15, 23 (1st Cir. 2017) (internal quotation marks omitted) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988) and citing 28 U.S.C. § 1367(c)(3)).  "[I]t is an abuse of discretion for a district court to retain jurisdiction over the remaining pendent state law claims unless doing so would serve the interests of fairness, judicial economy, convenience, and comity."  Id. (citations and internal quotation marks omitted).  Similarly, "it can be an abuse of discretion — if no federal claim remains — for a district court to retain jurisdiction over a pendent state law claim when that state law claim presents a substantial question of state law that is better addressed by the state

courts." Id. (citation and internal quotation marks omitted).

On balance, these considerations weigh in favor of remanding the state-law claims to the superior court. Though it may delay the case somewhat in the short term, there is nothing fundamentally unfair about remand. The parties have already fully briefed and argued the summary judgment issues here and should be ready to do the same in state court. This is especially true given that discovery closed after the summary judgment argument with neither side suggesting that discovery disputes remained unresolved. Similarly, remand should alleviate the concerns Esty's counsel expressed at the summary judgment hearing regarding additional non-party information he hoped to collect, as he has now had more than five additional months to secure that information. In light of these facts, remand serves the interests of fairness.

These same facts also undercut any suggestion that it is more convenient to litigate the state-law claims in this court than in state court. Given that both parties fully briefed and argued summary judgment and discovery is now closed, the remaining claims are teed up for resolution, either at summary judgment or at trial. As the claims arise under state law, there is no compelling reason for this court to be the one that resolves them.

41

Judicial economy cuts both ways.  On the one hand, both the court and the parties have expended time and resources litigating the state-law claims in this forum.  But at the same time, it may not be an economical use of a federal court's resources to resolve state-law claims over which it may decline jurisdiction when doing so comes at the expense other pending matters that fall within the court's original jurisdiction. Thus, while this factor does not weigh strongly in favor of remand, it similarly does not provide a convincing basis to retain jurisdiction.

Finally, comity weighs in favor of remand.  Quoting the Supreme Court, the First Circuit has repeatedly noted that "needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." Desjardins v. Willard, 777 F.3d 43, 46 (1st Cir. 2015) (brackets and quotation marks omitted) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)).  With the federal claims gone, there is no longer any need for this court to resolve the state-law claims.  It is therefore the better course for the state court to address those claims in the first instance.

While the court recognizes that remanding the state claims imposes some additional burden on the parties, it would not

serve the interests of fairness, judicial economy, convenience, and comity for this court to retain jurisdiction over those claims. The court accordingly remands Counts 1, 2, 4, 7, 8, and 9 to state court.[11]

## IV. CONCLUSION

For the reasons set forth above, the court **grants** the defendants' motion for summary judgment as to Counts 3, 5, and 6. The court declines supplemental jurisdiction over the remaining state-law claims and **remands** them to state court. All other pending motions are **denied as moot**. The Clerk of Court shall enter judgment accordingly and close the case.

SO ORDERED.

_Andrea K. Johnstone_
Andrea K. Johnstone
United States Magistrate Judge

June 8, 2018

cc:  Peter G. McGrath, Esq.
     Charles P. Bauer, Esq.
     John A. Curran, Esq.
     Matthew Vernon Burrows, Esq.
     Brian J.S. Cullen, Esq.

---

[11] Esty's counsel sought to withdraw several of these counts during the summary-judgment hearing. As the court declines jurisdiction over all of the state-law claims, it need not address this request.